THE STATE OF MARYLAND *vs.* CHARLES G. APPLEGARTH ET AL.

*License Taxes—Constitutional Law—License Tax Imposed on Oyster Packers—Title of Statute.*

The Legislature has the constitutional right to require the payment of a license fee for the privilege of carrying on a particular kind of business; and the question as to what occupations shall be licensed and what rates shall be charged, must generally be left to the discretion of the Legislature.

The oyster beds of the Chesapeake Bay are the property of the State, and the Legislature has the power to pass laws determining when oysters can be taken, and to make all reasonable regulations concerning the same.

Code, Art. 72, as amended by the Act of 1894, ch. 380, requires every person engaged in the business of packing or canning oysters for sale or transportation to take out a license, paying therefor a sum graduated according to the quantity of oysters packed by the applicant; the money so obtained to be placed to the credit of the Oyster Fund and used in maintaining a police force for the protection of oysters, etc. *Held,*

1st. That the license fee so required is not a tax on property, but a license tax on business or occupation.

2nd. That the provision requiring such license fees to be paid into the Oyster Fund is not open to objection, since, if the Legislature has the right to impose the tax, it can determine what shall be done with the money arising from it.

3rd. That such tax is not a regulation of inter-state commerce within the Constitution of the United States, since no exemption can be claimed from a general tax on business, upon the ground that the products thereof may be used in commerce.

The above mentioned Act of 1894, was entitled, An Act to repeal Art. 72 of the Code, title "Oysters," and to re-enact the same with amendments; and it provided that persons engaged in the business of packing oysters should pay a license tax. *Held,* that the Act was not in violation of Constitution, Art. 3, sec. 29, as embracing a subject distinct from the title.

Appeal and writ of error from the Criminal Court of Baltimore City. The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, BRISCOE, PAGE and BOYD, JJ.

*John Prentiss Poe, Attorney-General*, for the appellant.

*Edgar H. Gans*, for the appellees.

There is a great difference between a license required for purposes of *regulation* and a license which is used for the purpose of raising *revenue*. The first is imposed under the police power; the second under the taxing power; with the first, fees may be charged to defray the cost of the regulation; the second may be accompanied by a revenue exaction which bears no proportion to the costs of regulation. This distinction is of prime importance in this case. "When the grant is not made for revenue, but for regulation, a fee for the license may be exacted, but it must be such a fee only as will legitimately assist in the regulation; and it should not exceed the necessary or probable expense of issuing the license and of *inspecting and regulating the business which it covers.*" *Cooley on Taxation*, 598. If under the guise of licensing a municipal corporation should attempt to raise revenue, its ordinances would be void. *Vansant* v. *Harlem Stage Co.*, 59 Md. 335; *Steele* v. *Rowe*, 72 Md. 533; *Turner* v. *Maryland*, 107 U. S. 38.

Now, the business of packing and canning oysters for sale or transportation is not *regulated* by any part of the oyster law; the fees, so called, imposed by section 66, are not a part of any bill of costs for regulating *this business*; on the contrary, they go into the "Oyster Fund;" and this fund is expressly to be used to protect fish and oysters in Maryland waters by regulating the business of catching and taking oysters. To require A to take out a license to provide funds for regulating the business of B is a *tax* as to A. To impose a license fee on the oyster packer to provide money for regulating the business of the oyster dredger and tonger is a *tax* as to the oyster packer, but would not be a *tax* at all if imposed on the dredger and tonger, whose busi-

ness is being regulated. We are not contending that the oyster packer cannot be taxed by requiring license fees for the prosecution of his business, as the Attorney-General seems to think. We admit that his business or his property may be taxed just as any other business or property. But we do say he can't be singled out and be exclusively taxed for the maintenance of a general public burden when everybody else is not taxed to support such burden. With the exception of a small license tax of $25 imposed on commission men selling oysters, the packers and canners of oysters for sale or for transportation are the only persons in the State taxed for the general public burden. The oyster fund is made up of moneys received from dredging and tonging licenses—which we have seen are not taxes at all—from fines, penalties and forfeitures, incurred in the enforcement of the oyster laws, from a regulation fee imposed in the culling of oysters.

The question involved in this appeal is this: Can one class of men be taxed in their property or occupation, exclusively, by a method different from that used as to every other tax, to support a general public burden? We answer, no, for the following reasons: (1.) The tax is really on the property and not on the occupation. *State v. C. & P. R. R. Co.*, 40 Md. 22; *Welton v. State*, 91 U. S. 278; *Brown v. Maryland*, 12 Wheaton, 444. (2.) The nature of the taxing power requires uniformity. *Cooley, Taxation*, 141, 201, 244; *Desty on Taxation*, 29; *Wells v. Hyattsville*, 77 Md. 138; *Talbot Co. v. Queen Anne's Co.*, 50 Md. 245; *Dorgan v. Boston*, 12 Allen, 237; *Hammett v. Phila.*, 65 Pa. St. 151. From these authorities it appears that the citizen is guaranteed against arbitrary and irresponsible discrimination by the fundamental rules of taxation, which apply to all kinds of subjects. Can you tax only the traders of Baltimore City to build a bridge in Kent Co.? Evidently not, and yet the tax is on occupations and business. Nor could you tax the lawyers of Baltimore City, exclusively, to pay the salaries of the Judges of the Court of Appeals,

nor could you by a license tax on the occupation of the lawyers of Baltimore City alone, attempt to raise a revenue to pay for the Court House of said city. It is of the essence of taxation that there should be some system of apportionment. To select one single class in the community and tax it for a general public burden, is no more legitimate than to select one individual of that class for that purpose. It is not taxation, it is more like eminent domain, without the *compensation*. Why should oyster packers pay for the oyster navy, any more than criminal lawyers pay for the police force?

(3.) But if the license be regarded simply as a tax upon the business or occupation of the packer and canner, it would still be obnoxious to the constitutional rule. All other license taxes which are really *taxes* on occupations, such as traders, have a definite rule of apportionment. The license is regulated by the amount of the stock on hand, calculated by its value. In this case there is no calculation as to value. The tax is ten cents per hundred bushels, no matter whether oysters are high or low, and might just as validly be fifty cents per hundred bushels, or any other arbitrary sum. The rule of apportionment when once fixed must be uniformly applied in the same taxing district. *Tiedeman, Police Powers*, 477-8 ; *Cooley, Const. Lim.*, 619 ; *Knowlton* v. *Supervisors of Rock Co.*, 9 Wis.

(4.) If this license fee is to be regarded as a mere tax on the business of the packer, then this law embraces a subject distinct from its title, and distinct from the body of the Act. Traders' licenses are regulated by Code, Art. 56, sec. 35. Under that section packers have been exempt as manufacturers. If the object is to repeal this exemption, that object cannot be accomplished in a general oyster law.

Boyd, J., delivered the opinion of the Court.

The appellees were indicted for engaging in the business of packing and canning, for sale and transportation, oysters taken in the waters of this State, without obtaining from the State a license therefor. A demurrer to the indictment

was interposed, which was sustained, *pro forma*, by the Court below.   The prosecution is based on sections 66 and 67, Article 72 of the Code of Public General Laws, as amended by chapter 380 of the laws of 1894.   It is contended on behalf of the appellees that these sections are: (1), in conflict with the Constitution of this State, because the license provided for is an arbitrary and unequal tax, contrary to the 15th Article of the Bill of Rights, and not a lawful exercise of the police power of the State; and (2), that they are a regulation of inter-state commerce in violation of the Constitution of the United States.   We will consider the case in that order.

There has been on our statute books for many years legislation having in view the protection and preservation of the oysters of this State.   Since 1860 a separate Article has been devoted to this subject in the several Codes of Public General Laws of Maryland.   For some years past the Legislatures have generally been called upon to devote more or less time to this important subject, and at the session of 1894, Article seventy-two, title, "Oysters," of the Code, was repealed and re-enacted with amendments. Section 66 of that Article, as thus amended, requires every person, firm or corporation engaged in the business of packing and canning oysters for sale or transportation, to take out, on or before the first day of September in each year, a license to engage in such business by application to the Clerk of the Circuit Court of the county in which the place of business of such applicant is situated, or to the Clerk of the Court of Common Pleas, if in Baltimore City. The applicant is required to state the number of bushels of oysters which he proposes to pack during the succeeding eight months, and to pay at the time of issuing the license the sum of twenty-five dollars for such license, and in addition thereto, the sum of one dollar per thousand for every thousand bushels over ten thousand so estimated in his application, as the total number to be packed during the season.   He is also required to make a return under oath

within thirty days after the 25th day of April in each year
(that being the end of the season in which oysters can be
caught), to the clerk from whom he obtained the license, of
the number of bushels packed or canned by him during the
season, and to pay the clerk the further license money of
one dollar per thousand for each thousand bushels packed
or canned by him over and above the estimate in his appli-
cation.   This report must be forwarded to the Comptroller
of the State, who is authorized to return any overpayment
in case he is satisfied that the total number of bushels
packed by said person was less than the number stated in
his application.   This section further provides, that all
moneys thus received from said licenses shall be paid over
and accounted for by the clerks to the Comptroller, to be
placed by him to the credit of the Oyster Fund, as pro-
vided by section 29 of said Article.   The latter section
provides for the payment of moneys received from dredging
licenses and other sources therein named into the treasury,
to be "placed to the credit of a fund, which shall be called
'The Oyster Fund,' and the same shall be kept separate
and distinct from other funds in the treasury, and shall only
be drawn upon for the purpose of maintaining sufficient and
proper police regulations for the protection of fish and
oysters in Maryland waters, and in the payment of the offi-
cers and men and keeping in repair and supplying the
necessary means of sailing the boats and vessels of the
State Fishery Force."   Section 67 fixes penalties for the
violation of section 66, and authorizes any person to pay
the sum of $300 *per annum* for a license, without being
required to report the number of bushels handled by him
or otherwise disclose the operation of his business.

The above are the material parts of the sections of this
law directly involved in this case.   An examination of the
other provisions of this Article will show that the Legisla-
ture has required those engaged in catching and taking
oysters for sale out of the waters of Maryland with rakes,
tongs, scoops, dredges and other instruments, to take out

licenses, and also those engaged in selling oysters on commission. It will also be seen that great care has been taken to require persons connected with the oyster business to deal fairly with the State, and large outlays .of money are provided for, to be paid out of the Oyster Fund, for the purpose of regulating, preserving and protecting this important and valuable industry of our State.

In considering this question, it is well to bear in mind that the oyster beds are the property of the State (*McCready* v. *Virginia*, 94 U. S. 391; *Bradshaw* v. *Lankford*, 73 Md. 431), and that the Legislature, representing the sovereign power of the State, can pass laws determining how oysters can be taken, can prohibit them from being taken at all, or make such other reasonable regulations concerning them as it may deem best and proper for the interests of the State at large. If the restrictions imposed upon those engaged in the business of taking oysters be withdrawn, the oyster beds might be destroyed or at least seriously injured. It has therefore been deemed proper by the Legislature to provide a "State Fishery Force" at large expense, to enforce the laws passed for their preservation and protection. If the income from licenses granted under laws existing prior to 1894 proved insufficient to meet the demands on the State, the Legislature had the undoubted right to provide for the deficiency, provided, of course, it kept within constitutional bounds. If there be a class of persons engaged in business in this State who are largely dependent upon the oysters in the waters of this State for the conduct of their business, but who had heretofore not been required to have and pay for licenses for the privilege of engaging in such occupation, we can see no just or equitable ground to restrain the Legislature from requiring them to do so, unless prohibited by the organic law of this State or of the United States. Such legislation on this particular subject might well be justified on the ground that the State, as owner of the oysters, is entitled to a reasonable and fair compensation for them, and it may not be deemed just or wise to impose

all the burden on those who oftentimes undergo great hardship and suffering in catching them; and, therefore, those engaged in packing and canning them are called upon to contribute their share of the compensation.  If the State is not to profit by sales of its property, it should at least be protected from any loss in caring for it, and all those engaged in the oyster business might justly be required to contribute their proportion of the cost and expense of preserving them.

When we remember that oysters in the waters of the State belong to it, and see from an examination of the Article of the Code in which the sections now before us are embraced, the great expense incurred by the State in fostering and encouraging this industry and preserving the oysters, and that all the revenue derived from the licenses objected to in this case are required to be placed in the separate fund applicable to those purposes, we might perhaps content ourselves by declaring this law to be valid on the ground that these license fees are imposed for the regulation of the oyster business, with which oyster packers are connected.  But we are now dealing with a statute passed by the Legislature for the benefit of the State, and we are not called upon to draw nice distinctions between the power to license for regulation and the power to license with a view to revenue, as is sometimes required in construing charters of municipal corporations, for the purpose of determining whether or not such corporation had the power to exact certain license fees.  The cases of *Vansant* v. *Harlem Stage Co.*, 59 Md. 335, and *State* v. *Rowe*, 72 Md. 553, cited by the appellees are of the latter kind.

The privilege of carrying on the business of packing and canning oysters is made, by this law, to depend upon the taking out of a license, and we do not think the provisions of the State Constitution looking to equality and uniformity in taxation are thereby violated.  It is said in *Tiedeman's Limitations of Police Power*, 282, that "the most common objection raised to the enforcement of a license tax is that

it offends the constitutional provision, which requires uniformity of taxation, since the determination of the sum that shall be required of each trade or occupation must necessarily, in some degree, be arbitrary, and the amount demanded more or less irregular.   But the Courts have generally held that the constitutional requirement as to uniformity of taxation had no reference to taxation of occupation." The right to require the payment of license fees for the privilege of carrying on business of different kinds has been recognized for many years in this State, and the license fees required to be paid have been fixed, in the discretion of the Legislature, according to circumstances and the character of the business.   Take for example the licenses to brokers. Exchange and insurance brokers are each required to pay one hundred dollars *per annum* ; stock and merchandise brokers, seventy-five dollars ; real estate and bill brokers, fifty dollars *per annum*.   Those engaged in the sale of ordinary goods, chattels, wares or merchandise are required to pay, according to the amount of stock, at the principal season of sale, thus varying from twelve to one hundred and fifty dollars *per annum*.   Those selling spirituous or fermented liquors in quantities not less than a pint are required to pay from eighteen to one hundred and fifty dollars *per annum*, while ordinary keepers pay from twenty-five to four hundred and fifty-dollars, according to the rental or annual value of the premises.   Other instances might be cited, but these serve to illustrate what has been the practice in this State, and it would scarcely be contended that licenses cannot be required of persons engaging in such occupations as those above mentioned.   Upon what principle then is the license fee required of oyster packers illegal ?   It is argued that the method adopted is novel. If that be admitted, it does not invalidate the law, but it does not materially differ from the traders' licenses so far as the method of fixing the rate is concerned.   In the latter the license fee is graduated according to the amount of stock on hand at the principal season of sale, whilst in

this it is according to the number of oysters packed—the effort in each case being to require payment according to the amount of the business done in the occupation taxed.

We do not agree with the learned counsel for the appellees, that this law imposes a tax on the property and not on the occupation. In the case of the *State* v. *C. & P. R. R. Co.*, 40 Md. 22, relied on by him, the Act of Assembly in question prohibited coal mining companies from transporting any coal mined in this State, until a State tax of two cents per ton *on said coal* was paid. It was intended to be in lieu of all other State taxes to be paid by those companies, and expressly provided that the Comptroller should give the companies paying the tax discharges from State taxes on their capital stock. It being manifestly and confessedly a direct tax on the property, in the opinion of four out of seven Judges who sat in the case, they held the law to be in violation of the 15th Article of the Bill of Rights of this State. The other three Judges dissented on the ground that it was not unconstitutional, notwithstanding the language of the statute. This case differs widely from that, as this law simply provides for a license tax on the business or occupation of those engaged in packing or canning oysters, and not for a tax on property. In *State* v. *P. W. & B. R. R. Co.*, 45 Md. 361, this Court held that a tax of one half of one per centum upon the gross receipts of railroad companies was not a direct tax upon the property of the companies within the meaning of the 15th Article of the Bill of Rights. It was such a tax as might be imposed or laid "with a particular view for the good government and benefit of the community," and not such as was prohibited under the prior clause of this Article. Although that case differs from this, we refer to it as reflecting upon the character of tax, which the clause in the 15th Article of the Bill of Rights relied on refers to, as construed by this Court. See also *Rohr* v. *Gray*, 80 Md. 274. It is true that the burden imposed on oyster packers as a class may differ from that on other occupations, but that is

for the sound discretion of the Legislature. An attorney at law may not pay taxes on one dollar's worth of property, and he is not now required to pay any license tax to the State for the privilege of practising his profession, whilst his neighbor, if a merchant, not only pays taxes on his stock of goods, but is required to pay a license tax before he can sell one dollar's worth of goods, yet it cannot be successfully contended that the law of this State requiring merchants to pay a license tax is unconstitutional. The Courts must leave to the sound discretion of the Legislature, which of course should be honestly exercised, the question as to what occupations shall be licensed, what rates shall be charged, &c., so long as the laws do not manifestly conflict with some provision of the Constitution of the United States or of the State. The method adopted in this case is probably as just as could be established. It is regulated by the amount of business done, and the privilege is given of paying the sum of three hundred dollars as a fixed amount, instead of being governed by the number of bushels packed. If the Legislature had arbitrarily fixed three hundred dollars as the license tax to be paid by all oyster packers, the right to do so could not be questioned. Why, then, could it not adopt as a minimum license fee, twenty-five dollars, and as a maximum, three hundred dollars, with a sliding scale between those sums, according to the amount of business done? This is practically what was done.

Again, it was contended on the part of the appellees, that if the license fee is to be regarded as a mere tax on the business of the packer, then this law embraces a subject distinct from its title and from the body of the Act. The Act of 1894, as has already been said, repealed and re-enacted Article 72 of the Code, and included all the Public General Laws on the subject of oysters to the date of its passage. It adopted various regulations for the government of those connected with the oyster business, and in doing so provided for licenses to packers. It was therefore not

only unobjectionable, but very appropriate to include the
provisions of sections 66 and 67 in this Article. They are
a part of the system adopted by the Legislature to regulate,
protect and preserve the oysters of the State, and hence
were embraced in this Article. This is not without prece-
dent in this State. In Article 23, title "Corporations," we find
sub-divisions of "Insurance Companies" and "Insurance
Department," and under the latter provision is made for
licensing agents of foreign insurance companies, who are
required to pay two hundred dollars per annum, and also a
tax of one and a-half per centum on the premiums collected,
received or secured in this State or from residents thereof,
in addition to some other fees named. The State has a large
revenue from that source. Nor do we see any objection to
the provision of the law requiring the license fees collected
of the oyster packers to be paid into the Oyster Fund.
Whether the money goes into the general treasury, and any
deficiency in the Oyster Fund is made up by the State out
of the general fund, or whether it be paid directly into the
Oyster Fund, can make no possible difference to the packers.
They are really benefited by the method adopted by this
law, as the money paid by them is required to be used for
purposes connected with the oyster business, in which they
are directly interested. If the State has the right to impose
the license tax, as we hold it has, it can certainly determine
what shall be done with the money, as long as no unlawful
use is made of it.

Having considered the various objections urged by the
learned counsel for the appellees to this law, we are of
opinion that treating it as a tax on the occupation of these
persons the law is not obnoxious to any of the provisions
of our State Constitution, and therefore must be sustained,
unless it be in conflict with the Federal Constitution, which
we will briefly refer to. But little stress was laid on this
ground of defence, either in the oral argument or the brief
filed by the appellees. We do not see how there can be
any serious question about the validity of this law, so far

as affected by the Constitution of the United States.   The
law does not in any way discriminate in favor of the citizens
of this State against the citizens of other States.   On the
contrary, it only applies to those whose places of business
are in this State.   Nor do we think it can be said that it in
any way regulates or undertakes to regulate interstate com-
merce.   It was suggested in argument that as the law re-
quired licenses by those engaged in packing or canning
oysters for " sale or transportation," the latter clause made
the law objectionable.   That term was evidently used to
exempt those who packed or canned oysters for their own
purposes, but not for sale or transportation.  Of course, oyster
packers in this State may sell or transport all their oysters
within the State, or they may sell or transport some of them
beyond the State.   But that does not prohibit the State from
taxing them for the prosecution of their business within the
State.  It was said as early as the case of *Nathan* v. *Louisiana*,
8 Howard, 80, that "no one can claim an exemption from a
general tax on his business within the State on the ground
that the products sold may be used in commerce.   No
State can tax an export or an import as such, except under
the limitations of the Constitution.   But before the article
becomes an export, or after it ceases to be an import, by
being mingled with other property in the State, it is a sub-
ject of taxation by the State.   A cotton broker may be re-
quired to pay a tax upon his business, or by way of license,
although he may buy and sell cotton for foreign exporta-
tion."   Although it is sometimes difficult to draw the line
between what is and what is not a regulation of commerce
among the States, we have been referred to no case, and
know of none decided by the Federal Courts that will bring
this case within any of those classes that have been held to
be in conflict with the Constitution of the United States.

   Being of the opinion, then, that there is no well founded
constitutional objection to the law under consideration,
viewing it from the standpoint of either the Federal or State
Constitution, and recognizing the right of the Legislature

under those circumstances to pass it, we must reverse the judgment below and award a new trial.

> *Judgment reversed and new trial awarded.*

(Decided May 16th, 1895.)