## CLINTON MEUSHAW *vs.* STATE OF MARYLAND.

*Municipal Corporations—Validity of Ordinance of Baltimore City Imposing a Tax upon Dealers in the Wholesale Produce Market—Time of Payment of Licenses in Baltimore City.*

An ordinance of Baltimore City established a wholesale produce market and provided as follows in one of its sections:"All dealers and commission men shall pay in advance two hundred dollars per annum for the use and privilege of selling in this market. Wholesaling in the public streets is unlawful." The City Charter, Sec. 6, confers on the Mayor and City Council full power and authority "to license, tax and regulate all businesses, trades, avocations or professions;" and also to license and regulate the sale of fresh fruits, meats, vegetables and all other perishable articles. *Held,* that under the charter, the City had the right to impose this tax for revenue upon dealers selling in the produce market.

*Held,* further, that the tax is not unreasonable in amount in view of the privileges granted and of the cost of erecting and maintaining the market.

Every fair intendment should be made in favor of the reasonableness of a license tax imposed by a municipal corporation acting within the scope of its authority.

The ordinance of Baltimore City providing that persons selling
in the wholesale produce market should pay two hundred dol-
lars per annum in advance for the privilege of so doing was
approved May 20th, 1907.   One section of the ordinance pro-
vided that licenses for selling shall begin on May 1st of each
year and must be paid by May 10th of each year.   The appel-
lant was indicted for selling at wholesale in said market in
June, 1907, without a license.   *Held,* that the appellant was
not entitled to sell in said market during the year 1907 with-
out paying the tax imposed by the ordinance.

The provision in Sec. 59 of the Baltimore City Charter, that
"all licenses imposed by ordinance shall be due and collectible
in the first week in January in each year," does not apply to
the revenue tax imposed by the Ordinance of 1907 upon per-
sons selling in the wholesale produce market.

*Decided December 2nd, 1908.*

Appeal from the Criminal Court of Baltimore City
(WRIGHT J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, SCHMUCKER, BURKE, THOMAS and WORTHINGTON,
JJ.

*M. R. Walter* and *J. Charles Linthicum,* for the appellant.

*Isaac Lobe Straus, Attorney General,* for the appellee.

BURKE, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore, by Ordinance
283, approved May 20th, 1907, made provision for the erec-
tion and maintenance of a wholesale produce market in Bal-
timore City.   Section 101 of the Ordinance defined the limits
of the market; section 102 provided that it should be used
solely for the purpose of wholesaling all produce and fruits
brought to Baltimore in vehicles, and that retailing therein
should be unlawful; section 104 declared that no permanent

structures of any character should be erected within the market; section 105 provided that the market should be open every day in the week, except Sundays and holidays, between the hours of three o'clock A. M. and six o'clock P. M., and should be thoroughly cleansed every market day after five o'clock P. M.

Sections 106 and 107, which give rise to the important legal questions presented by the record, are as follows:

"106. All dealers and commission men shall pay in advance two hundred dollars per annum for the use and privilege of selling in this market. Wholesaling in the public streets is unlawful. 107. License for selling shall begin May 1 of each year, and must be paid by May 10 of each year, otherwise the same shall be void."

Section 108 imposes certain duties upon the assistant market master, and makes it unlawful for anyone to interfere with him in the discharge of his duties. It then provides that "anyone failing, or refusing to observe, or violating the provisions and requirements of Section 106 to 108 shall be deemed guilty of a misdemeanor, and shall be subject to a fine of ten dollars for each and every offense, the same to be collected as other fines and penalties are collected."

Clinton Meushaw, the appellant, was indicted and convicted in the Criminal Court of Baltimore for violating the provisions and requirements of this Ordinance, and was adjudged to pay a fine of ten dollars and costs. From this judgment he has brought this appeal. The indictment contains six counts; but the fourth and fifth counts were quashed by the Court at the request of the State's Attorney. It is unnecessary to set out the averments of the remaining counts. They each substantially charge that on the 29th of June, 1907, the appellant being a dealer and commission man engaged in selling produce and fruits at wholesale in the wholesale produce market of Baltimore City, did sell at wholesale in said market produce and fruits brought to said City and market in wagons, without having paid two hundred dollars per annum for the use and privilege of selling produce and

fruits in said market, in violation of Sections 106 and 108 of
the above mentioned Ordinance. The traverser demurred
to each count of the indictment, but the Court overruled the
demurrer, and the case proceeded to trial upon the joinder of
issue upon the appellant's plea of not guilty.

The State offered in evidence Sections 101, 102, 103, 104,
105, 106 and 108 of the Ordinance above mentioned. It
then produced Mr. Harry Hooper, the City Comptroller
whose duty it is to collect the market rentals and license fees,
who testified that he had the record of the persons who oc-
cupied the wholesale produce market during the year 1907,
and of those who paid the rentals or license fees for that
year required by the Ordinance offered in evidence which is
two hundred dollars, and that the traverser did not pay said
sum. It then called Mr. Sanner, the assistant market master
at Centre Market, which includes the wholesale produce
market, who testified that he visited the market daily from
May 20, 1907 to July 1, 1907, and that continuously during
that period he saw the traverser, who was a wholesale pro-
duce dealer, or commission merchant, selling at wholesale all
sorts of produce, fruits, and strawberries; that he sold in the
wholesale produce market whenever he could get his wagon
in; that the produce reached the market by wagons, and was
sold by the wagon load within the limits of the market, and
in one of the said aisles which ran through the market; that
the traverser never paid the fee of two hundred dollars re-
quired by the Ordinance, but refused to pay the same, and
that after his refusal to pay he continued to sell as a commis-
sion merchant until July 1. This witness on cross-examina-
tion said that the seven aisles were driveways with seven
openings, running from the east to the west, from Market
Space to West Falls Avenue, straight through the market.
The following questions were asked the witness on cross-
examination: "1. Suppose a wagon went in one of these
aisles, could it get in the other aisle?" "2. Suppose a wagon
in that aisle would sell its goods before a wagon ahead of it,
could the wagon which had sold get out?" "3. Where was

Mr. Meushaw selling before the market was completed?"
"4. Did you notify him that he must go to this market?"
The Court, upon objected by the State refused to allow the
witness to answer these questions, and these rulings consti-
tute the appellant's first, second, third, and fourth bills of
exception.

Charles H. Schenkel was called and testified that Meu-
shaw did business in the wholesale produce market dur-
ing the whole season of 1907, that is during July, Au-
gust, and September of that year; that he sold produce by
the wholesale, which is brought in country wagons, and sold
from the wagons, the wagons being somewhere in one of the
seven aisles. On cross-examination the witness was asked the
following questions which the Court, upon objections by the
State, would not permit him to answer: "1. Was there any
special aisle assigned to any of these commission merchants?"
"2. Can you explain to the jury how these aisles are con-
structed?" These rulings are made the subject of the traver-
ser's fifth and sixth bills of exception. He then offered to
read to the jury Section 107 of the Ordinance; but the Court
would not allow it to be read in evidence. This ruling con-
stitutes the seventh and last bill of exception.

With this statement of the material facts we are prepared
to consider the reasons urged by the appellant in support of
the demurrer. It is said that the charge of two hundred dol-
lars imposed by Section 106 of the Ordinance is void: First,
because it is unreasonable. Second, because it is not uni-
form as to all produce dealers and commission men. Third,
because there is no authority under the Charter of Baltimore
City given to the Mayor and City Council to impose such a
charge for the use of the market. Fourth, that if the Ordi-
nance be not invalid for any or all of these reasons, it is con-
tended that the appellant had not violated any of the provi-
sions of the Ordinance if Section 107 be valid, because the
charge imposed by Section 106 was not payable for the year
1907 since the Ordinance was not approved until May 20,
1907, and, therefore, the requirement of that section could

not become operative or binding upon the traverser until May 1, 1908; but, it is further contended that if that Section be invalid, the demurrer should have been sustained, because by Section 59 of the City Charter the license imposed was not due and collectible until the first week of January, 1908.

As the demurrer denies the power of the City to pass the Ordinance it is proper in the first place to advert to the general rule respecting the construction of municipal powers. In *St. Mary's Industrial School* v. *Brown,* 45 Md. 310, this Court, speaking through Judge Alvey, stated the rule in these words: "And first and principally, we must bear in mind that all such powers are delegated, and depend upon legislative charter or grant; and that the corporate authorities can exercise no power which is not, in express terms, or by fair and reasonable implication, conferred upon the corporation. In construing a grant of municipal powers, in the case of *Minturn* v. *Larue,* 23 How. 435, the Supreme Court of the United States but announced a well established rule when it said, 'It is a well settled rule of construction of grants by the Legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the Act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the Legislature must be resolved in favor of the public. This principle has been so often applied in the construction of corporate powers, that we need not stop to refer to the authorities.'"

This is conceded to be the universally accepted rule, and a citation of the numerous cases in this Court in which it has been applied is unnecessary. In this case it is not denied that the City has the power to erect, regulate, or maintain the market, or to license and regulate the sale of fresh fruits, meats, vegetables, and all other perishable articles in the City of Baltimore, because this power is expressly conferred upon the Mayor and City Council by Section 6 of the Charter. The City had the unquestionable right under the

powers conferred by that Section to regulate the sale of produce in Baltimore City.

It was contended at the hearing that the cases of *State v. Rowe*, 72 Md. 550; and *Vansant v. The Harlem Stage Company*, 59 Md. 334 have conclusively settled the invalidity of this license upon two grounds: first, because of its unreasonableness; and secondly, because of the want of power in the City to impose it. In *Rowe's* case this Court held invalid an Ordinance of the Mayor and City Council of Baltimore providing that no person should be permitted to use Centre Market for the sale of fish and crabs without first paying to the Clerk of that Market one hundred dollars yearly for the license provided in Section 2 of the Ordinance. It was sought to uphold the Ordinance as a lawful exercise of the power conferred upon the City "to erect and regulate markets" and "lease, sell, and dispose of the stalls and stands in any manner and for any term it might think proper." In reply to this contention the Court said: "A fair and reasonable construction of this power can only give the City authorities, as owners of the market houses, the power of selling and leasing the stalls in their buildings as they may judge fit, and the power to regulate the markets, given by Section 671, can only be held to intend to give reasonable police powers with reference thereto." The Court then noticed the *Vansant case, supra.* In that case the Mayor and City Council, under the power conferred by the Act of 1880, Chapter 69 *to license* carriages and all vehicles, including carts, drays, omnibuses, wagons, etc., and *"to license and regulate"* the employment of hackmen, draymen, etc., and imposed a tax of seventy-five dollars on each omnibus, and fifty dollars on every renewal. The Court held this tax void, because it was a clear attempt on the part of the City to exercise a power which had not been granted. "As the word 'tax,'" say the Court, "was no where to be found in the law, they could not hold under that law anything more than the bestowal of a police power; and that although the power to license and regulate gave it the power to impose *some* tax, it was the mere

*incident* to the *main purpose* of the law, and only the means of carrying the law into effect."

But we think it perfectly clear that the question we are dealing with is not controlled by those cases. This is not a question of the exercise of *mere* police power, or of the power *merely* to license or regulate. Much larger and broader powers are granted to the City under the New Charter with respect to the subject matter we are considering than were possessed by it at the time the *Rowe* and *Vansant* cases were decided. Under Section 6 of the Charter the Mayor and City Council is given the power "to license, *tax* and regulate all businesses, trades, avocations or professions," and under this grant of power the City had the clear right to impose the charge of two hundred dollars "for the use and privilege of selling in this market." This conclusion, we think, is fully supported by the cases of *Mason* v. *Cumberland,* 92 Md. 451; *The Commissioners of Cambridge* v. *The Cambridge Water Company,* 99 Md. 501; *and State* v. *Applegarth,* 81 Md. 293.

The City has expended large sums in the erection and maintenance of this Market, and the charge exacted of the class of persons mentioned in the Ordinance is not strictly a license, or regulation tax, but is a tax for revenue imposed by the City upon persons engaged in the wholesale produce business in that market. The Court below upheld the Ordinance, "upon the right of the City to make a reasonable charge for the accommodations furnished, though under the new Charter vesting in the City the right to license, tax, and regulate all business, trades, avocations or professions authority therefor may be found."

Nor do we think the charge made can be said to be unreasonable. It is less than fifty-five cents per day for the enjoyment of the facilities and privileges afforded. This seems to be a moderate sum to be paid as compensation for the advantages conferred by the Ordinance. The Court, in any case, should be cautious in declaring a tax laid by competent authorities to be unreasonable, or excessive, because, as was

said in *Vansant's case, supra,* the Mayor and City Council of Baltimore are primarily at least the judges of what is a reasonable tax, and that if there be doubt upon the question a Court should be slow to revise the judgment of the City Council, and that every fair intendment should be made in its favor. There appears to be a general concurrence of authority that the power to license and tax occupations and privileges includes the power to license and tax as a condition precedent to entering upon and exercising such occupations or privileges, and that such taxes are not governed by the ordinary rules controlling property taxation.

The lower Court held Section 107 invalid. The Act is complete and effective without it, and to give it the construction contended for by the appellant would not only frustrate the real purpose and intent of the Ordinance, but would permit the class of persons named therein to use the market for the season of 1907, as the traverser did, and enjoy all of its privileges and advantages without cost. This would be most unreasonable and unjust to the City, and the Court correctly held that the payment of the charge was a condition precedent to the right to sell in the market.

Section 59 of the Charter, which declares that all licenses imposed by Ordinance shall be due and payable in the first week of January in each year, does not apply to, or include charges of the kind imposed by this Ordinance. It applies to purely license taxes. There is a broad distinction between revenue received from the exercise of the power to license and regulate, and revenue received under the power to tax. This Section has reference to money received or payable under the exercise of the first-named power. *Cooley on Taxation,* 598; *State* v. *Rowe,* 72 Md. 548; *Mason* v. *Cumberland,* 92 Md. 451.

What we have said disposes of the appellant's seventh bill of exception. We have in an earlier part of this opinion set out the questions embraced in the other exceptions. Three of these questions suggest that some changes in the arrangement of the market ought possibly to be made so as to afford

better facilities and accommodations to persons using the market; but that is a matter exclusively for the Mayor and City Council to consider. We do not think it necessary to discuss the exceptions, as it will be apparent from reading them, that none of them has the slightest relevancy to the real issue which the jury was impanelled to try.

*Judgment affirmed with costs.*